Glenda M. LAUGHINGHOUSE, Plaintiff,

v.

Jerry RISSER, et al., Defendants.

No. 87–4257–R.

United States District Court, D. Kansas.

Feb. 14, 1992.

See also, 754 F.Supp. 836.

Brock R. Snyder, Law Office of Brock R. Snyder, Brian S. Frost, Florez & Frost, P.A., Topeka, Kan., for plaintiff.

William G. Haynes, Frieden, Haynes & Forbes, Topeka, Kan., for defendants.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This case has been tried before a jury and to the court. It is now before the court upon defendants' motion for new trial, for alteration or amendment of the judgment and/or for judgment notwithstanding the verdict. The motion is addressed entirely toward the jury verdict in this case.

Defendants have objected to a response brief plaintiff filed after defendants' reply brief. Plaintiff did not ask for leave to file

the brief, and the brief technically violates the rules of this court. So, the court shall direct the Clerk to strike the brief (Doc. # 216).

Plaintiff brought this case against two defendants, Jerry Risser and American General Finance, Inc. ("AGF"). Plaintiff and Mr. Risser were employees of a company, "Credithrift", which later became part of AGF. Credithrift was a consumer loan company. Mr. Risser was plaintiff's supervisor while plaintiff worked as a branch manager of a Credithrift office in Topeka, Kansas. Plaintiff asserted that Mr. Risser's conduct as her supervisor constituted the tort of outrage. Plaintiff further asserted that Mr. Risser's conduct occurred within the scope of his employment with Credithrift. Finally, plaintiff alleged that Credithrift was negligent in retaining Mr. Risser as an employee. The jury found in favor of plaintiff on all of her claims. Plaintiff was awarded $100,000.00 in actual damages. The jury also assessed punitive damages against Mr. Risser in the sum of $10,000.00 and against AGF in the amount of $600,000.00.

■ The standard for granting judgment notwithstanding the verdict is precisely the same as the standard for directing a verdict. *Hurd v. American Hoist and Derrick Co.*, 734 F.2d 495, 499 (10th Cir.1984). A directed verdict is proper only when a party has presented such evidence that, without weighing the credibility of the witnesses, the only reasonable conclusion is in his favor. *Giandonato v. Sybron Corp.*, 804 F.2d 120, 123 (10th Cir.1986). The standards applicable to a motion for a new trial were set out in *Commons v. Montgomery Ward & Co.*, 614 F.Supp. 443, 449 (D.Kan.1985):

In ruling on a motion for a new trial, the trial judge has broad discretion. *Scholz Homes, Inc. v. Wallace*, 590 F.2d 860 (10th Cir.1979). He has the obligation or duty to ensure that justice is done, and, when justice so requires, he has the authority to set aside the jury's verdict. *Seven Provinces Ins. Co., Ltd. v. Commerce & Industry Ins. Co.*, 65 F.R.D. 674 (W.D.Mo.1975). He may do

so when he believes the verdict to be against the weight of the evidence or when prejudicial error has entered the record. *Holmes v. Wack*, 464 F.2d 86 (10th Cir.1972). In considering a motion for new trial, the court is permitted to weigh the evidence and it may order a new trial even if there is evidence to support the jury's verdict. 11 Wright & Miller, FEDERAL PRACTICE AND PROCEDURE § 2806.

As was stated in another case from this district:

[t]he court may evaluate the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice has resulted. However, the discretion of the court "should be exercised with caution, and the power to grant a new trial on this ground should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict."

*U.S. v. Suntar Roofing, Inc.*, 709 F.Supp. 1526, 1529 (D.Kan.1989) quoting, 3 C. Wright, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL Section 553 (2d ed. 1982); see also, *U.S. v. Lopez*, 576 F.2d 840, 845 n. 1 (10th Cir.1978) (when considering a motion for a new trial, a trial judge considers the credibility of witnesses and weighs the evidence); *Heyen v. U.S.*, 731 F.Supp. 1488, 1489 (D.Kan.1990) (new trial motion should be granted when the court believes the verdict is against the weight of the evidence, prejudicial error has occurred, or substantial justice has not been done).

Defendants' first argument in support of their motion is that the court erred by failing to give a requested instruction referring to peculiar susceptibility to emotional distress. Specifically, defendants assert: there was evidence from Dr. Elizabeth Pennick, a psychologist, that plaintiff was peculiarly susceptible to emotional distress; defendants were unaware of this trait; and the jury should have been instructed that defendants should not be liable for emotional distress which was the result of plaintiff's peculiar tendency to-

ward emotional anguish. Defendants contend that "[w]ithout the benefit of the proper instruction, the jury was led to believe that they were to find Defendant Risser liable for the tort of outrage since the plaintiff clearly suffered severe emotional distress even though the defendants had no knowledge that she was peculiarly susceptible to emotional distress."

Defendants cite *Roberts v. Saylor*, 230 Kan. 289, 294, 637 P.2d 1175 (1981) in support of their argument. This case states:

Proof of four elements is required to establish the cause of action [of outrage]: (1) The conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe.

....

The extreme distress required must be reasonable and justified under the circumstances, and there can be no liability where the plaintiff has appeared to suffer exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor had knowledge. *Dawson v. Associates Financial Services Co.*, 215 Kan. [814] at 820, 529 P.2d 104; Restatement (Second) of Torts § 46(1), comment f. The emotional distress must in fact exist, and it must be severe. Prosser, Law of Torts (4th ed.1971) at 59.

637 P.2d at 1179–1180.

Comment f of the Restatement (Second) of Torts § 46 further explains:

The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when

the actor proceeds in the face of such knowledge, where it would not be so if he did not know. It must be emphasized again, however, that major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough.

The Restatement listed the following as illustrations of persons with a peculiar susceptibility to emotional distress: an eccentric and mentally deficient old maid who has a delusion of a pot of gold in her back yard; an extremely superstitious farmer who believes in witchcraft; a pregnant woman who witnesses her pet dog being shot and suffers a miscarriage; and a hospital patient under orders to have complete rest and quiet.[1] The Kansas Supreme Court suggested that a person with multiple sclerosis might be particularly susceptible to emotional distress. *Dawson v. Associates Financial Services Co.*, 215 Kan. 814, 529 P.2d 104, 113 (1974).

■ We read these comments as requiring a plaintiff to demonstrate that the severe emotional distress she suffered was a reasonable and foreseeable result of defendant's extreme and outrageous conduct.

■ The court's instructions in this case stated:

In considering whether defendant Risser or defendant American General Finance, Inc. is liable to plaintiff because of extreme and outrageous conduct, you should determine if the conduct of defendant Risser:

1. Was extreme and outrageous;
2. Was intentionally or recklessly inflicted upon the plaintiff; and
3. Caused severe emotional distress to the plaintiff.

To be extreme and outrageous, the conduct complained of must have been so outrageous in character, and so extreme

---

**1.** These illustrations could be contrasted with the testimony of Dr. Pennick. While Dr. Pennick testified that it was unusual for a person to have plaintiff's reaction to defendants' conduct and that a normal person might not expect that reaction, she also testified that plaintiff had: a

"salt of the earth" type of personality; one of 16 types of personality; and a personality which 6 out of 100 people share. This sort of personality does not seem as "peculiar" as those described in the illustrations to the Restatement.

in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. If a recitation of the facts to an average member of the community would arouse his resentment against defendant Risser and would lead him to exclaim, "outrageous," then the conduct of the defendant would be deemed to have been extreme and outrageous.

Liability for outrage does not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities. Members of the public are necessarily expected and required to be hardened to a certain amount of criticism, rough language, and to occasional acts and words that are definitely inconsiderate and unkind. Freedom remains to express an unflattering opinion and to blow off relatively harmless steam which comes from an uncontrollable temper.

Reckless conduct means a disregard or an indifference to the consequence of that conduct under circumstances involving danger to life or safety of others, although no harm was intended. A person who is reckless must know or have reason to know of facts which create a high degree of risk of harm to another, and then, indifferent to what harm may result, proceeds to act.

Intent to cause severe emotional distress exists when one engages in conduct with a desire to cause this distress in another person, or when the actor knows his conduct will cause that result. Instruction No. 5.

In other words, the jury was instructed to decide as reasonable people, whether defendants' conduct was extreme and outrageous and whether defendants intended to cause severe emotional distress or reasonably should have known that the conduct would cause severe emotional distress. The instructions invited defendants to argue that their conduct would not be considered outrageous by a reasonable person; that defendants had no intent to cause plaintiff severe emotional distress; and that defendants reasonably could not have expected that their conduct would have resulted in severe emotional distress.

The jury was further instructed:

[I]t is important for you to consider only those damages that were proximately caused by the actions of the defendants.... An act or omission is a proximate cause if it was a substantial factor in bringing about or actually causing injury, that is, if the injury or damage was a reasonably foreseeable consequence of the defendant's act or omission.

Instruction No. 7. This instruction also permitted defendants to contend that they were not responsible for plaintiff's severe emotional distress because it was an unforeseeable consequence of plaintiff's "peculiar susceptibility" to emotional distress—a trait about which defendants, as reasonable people, were unaware.

The same instruction answers a related argument made by defendants in the instant motion. Defendants contend that the court did not include an instruction regarding the foreseeability of harm from AGF's alleged negligent retention of Risser as an employee. Instruction No. 7 pertains to this claim and to plaintiff's outrage claim. This instruction clearly states that plaintiff must demonstrate her damages were proximately caused by defendant's actions and that "an act or omission is a proximate cause ... if the injury or damage was a reasonably foreseeable consequence of the defendant's act or omission."[2]

In sum, we believe the instructions of the court were sufficient to inform the jury that if plaintiff's alleged injuries were not a reasonably foreseeable consequence of defendant's acts or omissions, then plaintiff could not recover for such injuries. Therefore, we reject defendants' first argument in support of the instant motion.

---

**2.** In Instruction No. 6, the jury was also told that, in order to recover upon the negligent retention of an employee claim, plaintiff had to establish that Credithrift knew or reasonably should have known of defendant Risser's unfitness or incompetence as an employee and that such unfitness or incompetence caused plaintiff's injury.

Defendants' second argument contends that AGF is entitled to a new trial on plaintiff's claim for punitive damages. Defendants assert that the court failed to instruct the jury on the element of recklessness as is required for a finding of liability for punitive damages against a corporation for negligent retention of an agent. The court rejects this argument. The jury was instructed that to find AGF liable for negligent retention of an employee, the plaintiff must demonstrate that Credithrift knew or reasonably should have known of the unfitness or incompetence of Mr. Risser as an employee. Instruction No. 6. The essence of "recklessness" is "an indifference whether wrong is done or not—an indifference to the rights of others." *Blackburn v. Colvin,* 191 Kan. 239, 380 P.2d 432, 437 (1963). The jury had to find that credit thrift acted with an indifference to the rights of plaintiff because the jury was required to find that Credithrift knew or reasonably should have known of the unfitness or incompetence of their employee and that such unfitness or incompetence caused plaintiff to suffer the tort of outrage. Therefore, the jury had to find recklessness when it determined that AGF was liable for the negligent retention of an employee. This was recognized in the case cited by defendants, *Plains Resources, inc. v. Gable,* 235 Kan. 580, 595, 682 P.2d 653 (1984). There, the trial court found that the employer "knew, or had reason to know, of Higgins' propensities and his intended conduct, but took no measure to protect the Plaintiff's interests." 682 P.2d at 661. On appeal, the Kansas Supreme Court recognized that "inherent in the trial court's findings is that the

negligent retention of Higgins was reckless and, therefore, a proper basis for allowance of punitive damages under *Kline [v. Multi-Media Cablevision, Inc.,* 233 Kan. 988, 666 P.2d 711 (1983) ] and Restatement (Second) of Torts § 909 (1977)." 682 P.2d at 665. In the case at bar, a finding of recklessness was also inherent in the jury's verdict on liability for negligent retention of an employee.[3]

Defendants' next argument is that the court should order a remittitur of the punitive damages award against AGF. The jury assessed punitive damages in the amount of $600,000.00 against AGF and $10,000.00 against defendant Risser. Defendants contend that the amount awarded was excessive and shocking, such as to raise an irresistible inference that passion, prejudice or other improper influence invaded the trial.

Defendants initially make this argument on the grounds that the disparity between punitive damages assessed against the "passive wrongdoer" (AGF) is too large in contrast to the amount assessed against the "active wrongdoer" (Risser). We reject this argument for many reasons. First, it assumes that AGF should not have been found liable for negligent retention of an employee. Obviously, the jury disagreed with this assessment. Second, the legal basis for assessing punitive damages on *respondeat superior* grounds is well-established. *Plains Resources, Inc. v. Gable,* 235 Kan. 580, 682 P.2d 653, 665 (1984) (recognizing Kansas courts' adoption of Restatement (Second) of Torts § 909 (1977)). In the U.S. Supreme Court's recent deci-

---

**3.** Even if the instruction on negligent retention of an employee was erroneous, the court would be hard-pressed to conclude that the jury's determination of punitive damages was affected by this alleged error. The jury was entitled to assess punitive damages against AGF not only because of Credithrift's negligent retention of Risser as an employee, but also because Risser was a managerial employee who was acting within the scope of his employment when, according to the jury, he committed outrageous acts against plaintiff. In other words, AGF was responsible for the same conduct of defendant Risser for two different reasons. One of these reasons was that Risser was acting within the

scope of his employment for Credithrift when he committed the tort of outrage. It stretches credulity and seems to ignore the spirit of FED. R.CIV.P. 61 to contend that a new trial is required because the jury may have assessed punitive damages differently if it had decided that Credithrift was not reckless in retaining Risser but that Credithrift was, nevertheless, responsible for his actions. See FED.R.CIV.P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."); *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 553, 104 S.Ct. 845, 849, 78 L.Ed.2d 663 (1984).

sion, *Pacific Mutual Life Insurance Co. v. Haslip,* —— U.S. ——, ——, 111 S.Ct. 1032, 1041, 113 L.Ed.2d 1 (3/4/91, slip op. at 11), the Court observed:

> Imposing exemplary damages on the corporation when its agent commits intentional fraud creates a strong incentive for vigilance by those in a position "to guard substantially against the evil to be prevented." *Louis Pizitz Dry Goods Co. v. Yeldell,* 274 U.S. 112, 116, 47 S.Ct. 509, 510, 71 L.Ed. 952 (1927). If an insurer were liable for such damages only upon proof that it was at fault independently, it would have an incentive to minimize oversight of its agents. Imposing liability without independent fault deters fraud more than a less stringent rule.

Third, the damages are not excessive when a comparison is made with other cases involving a claim of corporate responsibility for the actions of an employee. In *Malandris v. Merrill Lynch, Pierce, Fenner & Smith,* 703 F.2d 1152 (10th Cir.1981), *cert. denied,* 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983), a punitive damages verdict against a corporation found liable for intentional infliction of emotional distress as well as fraud and deceit was ordered reduced from three million to one million dollars. The Tenth Circuit permitted one million dollars in punitive damages to be assessed against the corporation, even though the Circuit concluded there was insufficient evidence of liability upon a negligent hiring claim. The Circuit held there was sufficient evidence of the participation or approval in tortious acts by managers of the defendant to permit one million dollars of punitive damages to be awarded against the corporate defendant, even though the most active wrongdoer was an account executive who made unauthorized transactions in plaintiff's account and misrepresented his actions to the plaintiff and her husband. The plaintiff in the *Malandris* case became somewhat paralyzed with depression as a result of the transactions at issue in that case. The plaintiff in the case at bar presented evidence of a similar reaction to the conduct of defendant Risser, a manager for Credithrift. There was evidence of depression, a change of personality, and of an inability to function in ways which had been normal for plaintiff. Also cf., *Pacific Mutual Life Ins. Co. v. Haslip, supra* ($840,000 punitive damages award on *respondeat superior* theory against an insurance company whose agent failed to properly remit premiums and thereby caused insurance coverage to lapse); *Davis v. Merrill Lynch, Pierce, Fenner & Smith,* 906 F.2d 1206 (8th Cir.1990) ($2 million punitive damages award sustained against employer of account executive who churned plaintiff's account); *Southwest Forest Industries, Inc. v. Sutton,* 868 F.2d 352 (10th Cir.1989) *cert. denied,* 494 U.S. 1017, 110 S.Ct. 1320, 108 L.Ed.2d 496 (1990) ($1 million punitive damages awarded sustained against a company in a retaliatory discharge action); *Plains Resources, Inc. v. Gable, supra* ($1 million punitive damages award against company for "outrageous conduct" of oil well sabotage by employee who had been negligently retained).

◼ Defendants further contend that the punitive damages award was the product of unfair speculation because no evidence of AGF's financial worth was ever presented. Defendants assert that it violates due process to permit a jury to assess punitive damages without evidence of the defendant's financial condition, citing *Adams v. Murakami,* 54 Cal.3d 105, 284 Cal.Rptr. 318, 326, 813 P.2d 1348, 1356 (1991). In *Adams,* without deciding whether the Constitution required evidence of a defendant's financial condition as a prerequisite for punitive damages, the California Supreme Court concluded it was doubtful that constitutionally meaningful judicial scrutiny of punitive damages awards could occur absent such evidence. The court in *Adams* also held that under California law the plaintiff had the burden of introducing evidence of the defendant's financial condition.

Defendants acknowledge that the result in *Adams* is contrary to the holding in *Folks v. Kansas Power and Light Co.,* 243 Kan. 57, 755 P.2d 1319, 1334 (1988). It is also contrary to the holdings of other fed-

eral cases which have placed the burden on the defendant to produce financial evidence which might be considered in mitigation of punitive damages. See *Woods–Drake v. Lundy,* 667 F.2d 1198, 1203 n. 9 (5th Cir. 1982); *Zarcone v. Perry,* 572 F.2d 52, 56–57 (2d Cir.1978); *Tri–Tron Int'l. v. Velto,* 525 F.2d 432, 438 (9th Cir.1975); *El–Ranco, Inc. v. First Nat'l Bank of Nevada,* 406 F.2d 1205, 1218–19 (9th Cir.1968) *cert. denied,* 396 U.S. 875, 90 S.Ct. 150, 24 L.Ed.2d 133 (1969); *Littlefield v. Mack,* 750 F.Supp. 1395, 1402 (N.D.Ill.1990) *aff'd,* 954 F.2d 1337, (7th Cir.1992); *Ortega v. City of Kansas City,* 659 F.Supp. 1201, 1213–14 (D.Kan.1987) *rev'd on other grds,* 875 F.2d 1497 (10th Cir.1989). Defendants suggest, however, that this might change in light of *Pacific Mutual Life Ins. Co. v. Haslip, supra.*

We disagree. In *Haslip,* the Supreme Court approved some specific procedures for assessing punitive damages in Alabama. The Court did not establish a bright line test as to what was permissible and what was impermissible. Indeed, the procedures which were approved required that the jury *not* consider the financial condition of the defendant. Upon review of a jury's award of punitive damages, the financial condition of the defendant could be considered. But, such consideration was only "authorized," not required. See *Central Alabama Electric Cooperative v. Tapley,* 546 So.2d 371, 376–77 (Ala.1989); *Green Oil Co. v. Hornsby,* 539 So.2d 218, 222 (1989); see also *Hammond v. City of Gadsden,* 493 So.2d 1374 (Ala.1986).

"A state's decision to allocate the burden of proof on a mitigating or justifying factor to the defendant 'is not subject to proscription under the Due Process Clause unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Davis v. Barber,* 853 F.2d 1418, 1426 (7th Cir.1988) quoting *Patterson v. New York,* 432 U.S. 197, 201–02, 97 S.Ct. 2319, 2322, 53 L.Ed.2d 281 (1977). We do not believe it is essential to due process that a plaintiff have the burden to prove the financial condition of a defendant when making a punitive damages claim. It is noteworthy that

in some civil rights cases defendants have the burden of showing that a civil rights violation did not cause an injury to plaintiff, even though the plaintiff has the burden of proving damages. See *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In this case, defendants could have introduced evidence concerning their financial condition. Defendants could have requested an instruction asking that the jury consider such evidence when making a decision about punitive damages. Defendants did neither.

Nor is it fundamentally unfair for a jury to assess punitive damages or for the court to review the award in the absence of financial information, in our opinion. However, in this case the jury was not totally in the dark as to the financial condition of AGF. The jury heard testimony that AGF has 1,130 offices and other evidence as to the size and type of loans offered by the Topeka office. This evidence provided the jury with some idea of the financial position of AGF. This buttresses our belief that no plain error or fundamental unfairness occurred in the assessment of punitive damages.

Defendants have also suggested that the jury's punitive damages award was excessive or invalid because the court permitted evidence to be presented regarding the conduct of defendant Risser prior to the date he was employed by Credithrift. We do not believe this is good grounds for relief from the verdict. Evidence regarding the motive of Mr. Risser was relevant to the claims going to the jury in this case. The jury was instructed that it could consider this evidence for certain purposes but that it should not consider evidence of sexual advances and sexual harassment in deciding whether Credithrift was negligent in retaining Mr. Risser. Instruction No. 10. The jury was also instructed that there was no evidence that Credithrift knew or should have known of prior incidents of sexual advances or sexual harassment. *Id.* The court does not recall a specific objection to this instruction at the instruction conference in this case, although defendants did

object to the introduction of such evidence and asked for a mistrial. Defendants did not offer a different instruction for the court's consideration. The jury was further instructed that plaintiff could not recover for conduct prior to September 18, 1985. Instruction No. 9. We believe the instructions permitted the jury to consider the evidence in a proper context.

Defendants have presented no authority for the proposition that a jury should not consider 404(b) evidence when punitive damages are sought on a vicarious liability theory. The jury found AGF to be vicariously liable for defendant Risser's conduct. In order to consider the acts of the agent, for which AGF as the master was liable even in punitive damages, the jury could consider evidence relating to the nature, extent and enormity of the wrong as well as the intent of the party committing it. See *Folks v. Kansas Power & Light Co., supra*. The 404(b) evidence which was admitted in this case related to these subjects, particularly the question of intent. Accordingly, the court finds no error in the admission of or instructions pertaining to evidence of prior misconduct. Nor does the court believe this evidence resulted in an excessive verdict.[4]

Defendants also allude to comments made in plaintiff's closing argument as a source for speculation by the jury which may have led to an excessive verdict. Specifically, defendants complain about references to AGF as a Fortune 500 company that had $3,000,000,000.00 worth of loans outstanding. There was evidence at trial that AGF had over 1,000 offices. There was also evidence that the Topeka office had over $2,000,000.00 in outstanding loans when plaintiff was working there. Thus, the jury had evidence indicating that AGF had a substantial financial worth. The jury could have considered this evidence when punitive damages were assessed. Defendants object that no evidence of AGF's exact net worth was presented and so the jury was left to speculate as to what amount of punitive damages should be awarded. However, defendants chose not to present this evidence, and they did not object to the comments of plaintiff's counsel in closing argument. We do not believe the verdict of the jury was excessive or that a new trial is necessary to prevent a miscarriage of justice. Accordingly, we refuse to disturb the verdict because of comments made in closing arguments. See *Matthews v. CTI Container Transport International Inc.*, 871 F.2d 270, 278 (2d Cir.1989) ("not every improper or poorly supported remark made in summation irreparably taints the proceedings"); *Ortega v. City of Kansas City, Kansas, supra*, 659 F.Supp. at 1214 ("probably improper" closing comments are not grounds for a new trial when a contemporaneous objection was not made and where a new trial is not required to prevent a miscarriage of justice).

Defendants' next argument is that defendants are entitled to judgment notwithstanding the verdict on plaintiff's claims of negligent retention and outrage. There are three parts to defendants' argument. First, defendants contend that there should be no verdict against AGF upon plaintiff's negligent retention claim because there was no evidence that plaintiff suffered physical harm because of Credithrift's actions. We disagree with defendants' view of the evidence and therefore reject this argument.

"In order to maintain an action for emotional distress caused by the negligence of a defendant, the plaintiff's distress must result in or be accompanied by a physical

---

4. The evidence, which shall be reviewed in greater detail later in this opinion, was sufficient to establish a long-standing course of abusive conduct which the jury could have decided was motivated to retaliate against plaintiff or simply to make her quit her job. The jury found that the conduct was outrageous, i.e., atrocious and utterly intolerable in a civilized society. The jury also found that plaintiff suffered severe emotional distress because of the misconduct. The court believes the evidence is sufficient to establish each of these findings. The jury also found that the conduct of defendants was intentional or reckless. It was also clear from the evidence that defendants, particularly AGF, had substantially greater financial resources than plaintiff. Reviewing the punitive damages award in light of these factors, the court does not find that the award is excessive or motivated by passion, prejudice or bias.

injury occurring contemporaneously with or shortly after the incident causing the emotional distress." *Payne v. General Motors Corp.*, 731 F.Supp. 1465, 1474 (D.Kan.1990). The purpose of the rule is to guard against emotional distress which is feigned or counterfeited. *Freeman v. Kansas State Network, Inc.*, 719 F.Supp. 995, 1001 (D.Kan.1989). The rule also recognizes that emotional distress is a common experience in life. *Id.* Physical injury is considered evidence or substantiation of severe and genuine emotional distress. *Fogarty v. Campbell 66 Exp., Inc.*, 640 F.Supp. 953, 958 (D.Kan.1986) citing Restatement (Second) of Torts § 436A Comment b.

In this case, we believe the letter and the spirit of the physical injury requirement has been satisfied. There was evidence in this case that plaintiff suffered hives, high blood pressure, angina, fatigue and depression as a result of the stress she felt from defendants' conduct. There was testimony that the stress was a major factor in plaintiff's hives, which were so severe that one doctor considered them life-threatening. There was other testimony which diagnosed plaintiff's condition as post-traumatic stress disorder. We believe this is sufficient evidence to establish the physical injury requirement. Cf., *Payne v. General Motors Corp., supra* (constant fatigue and exhaustion experienced because of alleged employment discrimination satisfies requirement); *Freeman v. Kansas State Network, Inc., supra* (inability to lactate satisfies requirement).

However, even if this requirement was not met, there would be no reason to enter judgment notwithstanding the verdict because defendants would still be liable for the same injuries under plaintiff's claim of outrage, for which there is no physical injury requirement.

Defendants' second argument is that the conduct in question in this case was not so extreme and outrageous as to prove plaintiff's claim of outrage. Again, we disagree. Defendant Risser was plaintiff's immediate supervisor. He spoke with her every day on the telephone. He visited plaintiff's office once a month or once every two weeks. Sometimes, he stayed for a few hours. Sometimes, he stayed more than a day. For approximately eighteen months, following plaintiff's refusal of a sexual proposition from defendant Risser, defendant Risser was constantly critical of plaintiff's performance. He ranted. He cursed. He called plaintiff "stupid" and attacked her personal life. He threatened to fire plaintiff. He screamed. He threw files, pencils, his glasses, and the telephone. He touched plaintiff in ways she considered offensive. He constantly engaged in sexual overtones. The testimony of other employees was that Mr. Risser was barbaric and vulgar. Other employees stated that they had never seen someone treated like the plaintiff; that Mr. Risser was abrasive with other employees but worse toward plaintiff. The testimony was that he talked down to women; that he was mean, obnoxious and rude. There was evidence that Mr. Risser's conduct was constant and consistent. Other employees left their jobs because of this conduct. There was evidence to support a finding that Mr. Risser's conduct was motivated by sexual bias. There was also evidence that Mr. Risser was angry that plaintiff attempted to go over his head to complain about his conduct. There was also evidence that Mr. Risser tried to "squeeze" employees until they "popped" if he wanted employees to leave.

Unlike many cases cited by defendants, the evidence in this case established a longstanding, daily pattern of abusive behavior. In *Gomez v. Hug*, 7 Kan.App.2d 603, 645 P.2d 916 (1982), the Kansas Court of Appeals indicated that whether racial invective and threats of violence experienced over several days might establish a claim outrage should have been decided by the trier of fact. The court noted:

The relative positions of Gomez and Hug are important here. Hug was the employer. Gomez was the employee. Hug spoke from the position of a county commissioner. These remarks had been made to Gomez by Hug over a period of several days. The tirade unleashed upon

Gomez on April 21, 1978 was terrifying to him. He was afraid of Hug, afraid for his job, afraid for his family. Each party argues a different meaning from these statements of Gomez' fear. It is an issue for the trier of fact.

. . . .

Certainly the rough edges of our society still need smoothing down and there must still be freedom to blow off harmless steam. But this vituperation was well beyond the bounds of freedom to blow off harmless steam. It is not a burden of American citizenship in the State of Kansas that such vitriolic bullying as was turned by Hug against Gomez, and its emotional and physical consequences, must be accepted without possibility of redress and accepted as often as it amuses the speaker to utter it. Kansas courts are not so impotent. At the very least the victim of such an attack has the right to have his grievance heard by a jury of average members of the community to know whether they would exclaim, "Outrageous!"

7 Kan.App.2d at 610–11, 645 P.2d 916. Also cf., *Dawson v. Associates Financial Services Co.*, 215 Kan. 814, 529 P.2d 104 (1974) (trial court erred in dismissing an outrage claim substantiated by evidence of four phone calls attempting to collect on a car loan from a person suffering multiple sclerosis).

As mentioned previously in this opinion, there was substantial evidence that plaintiff suffered severe emotional distress from this conduct. This appears undenied by defendants. In sum, we think the evidence of plaintiff's emotional distress and of an 18–month period of abusive treatment surpassed the threshold standards for a claim of outrage.

Defendants' third and final argument is that plaintiff's outrage claim is preempted by the statutory provisions of the Kansas Act Against Discrimination (KAAD), K.S.A. 44–1001, *et seq.* Defendants cite *Polson v. Davis*, 895 F.2d 705 (10th Cir.1990) for this argument. In *Polson*, the court held that KAAD preempted a retaliatory discharge claim. Plaintiff did not bring a discharge claim in this case. Moreover, plaintiff has not sought to expand the exceptions to Kansas' common law employment-at-will doctrine in this case. Therefore, the court does not need to investigate the availability of statutory remedies for the conduct in question. Plaintiff did bring a discrimination claim and could have brought a claim under KAAD. However, the tort of outrage contains elements not required for a claim under KAAD. Courts have held that employment discrimination does not necessarily amount to the tort of outrage. *Fletcher v. Wesley Medical Center*, 585 F.Supp. 1260, 1262 (D.Kan.1984). Accordingly, we do not find that plaintiff's cause of action for outrage was preempted by KAAD.

In conclusion, for the above-stated reasons, defendants' motion is denied.

IT IS SO ORDERED.